# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**
    Plaintiff,

v.                                                                Case No. 04-CR-224

**TRACY DEVOY,**
    Defendant.

## SENTENCING MEMORANDUM

The government indicted defendant Tracy Devoy on mail and wire fraud charges arising out of her scheme to defraud her employer, Sodexho USA, Inc. Defendant used her position as an administrative assistant at Sodexho's Elkhorn, Wisconsin office to create invoices payable to fictitious vendors, funneling the payments to herself. Defendant unlawfully obtained more than $50,000 from Sodexho before her conduct was discovered and she was terminated. Following her termination, she submitted an additional phony invoice and foiled Sodexho's attempt to contest her application for unemployment compensation benefits by erasing a message on her supervisor Margie Renninger's voice mail regarding a hearing on the claim, then by leaving a message for Sodexho's unemployment representative (purportedly from Renninger) indicating that Sodexho no longer wished to dispute the claim.

Defendant pleaded guilty to the charges, and the probation office prepared a pre-sentence report ("PSR") recommending an offense level of 13 (base level 7, U.S.S.G. § 2B1.1(a)(1), plus 6 based on amount of loss, § 2B1.1(b)(1)(D), plus 2 for abuse of a position of trust, § 3B1.3, and minus 2 for acceptance of responsibility, § 3E1.1(a)). Coupled with

a criminal history category of I, the PSR recommended an imprisonment range of 12-18 months under the sentencing guidelines.

Prior to sentencing, defendant made full restitution to Sodexho and also repaid the state of Wisconsin the unemployment compensation she had received. At sentencing, she objected to the 2 level enhancement under § 3B1.3 and argued for a sentence of community supervision and home confinement. The government argued for a sentence at the low end of the guideline range. In this memorandum I address the parties' contentions and set forth the reasons for the sentence imposed.

## I. SENTENCING PROCEDURE

In light of United States v. Booker, 125 S. Ct. 738 (2005), I typically follow a three-step sentencing process. First, I determine the applicable advisory guideline range, resolving any factual disputes. Second, I determine whether, pursuant to the Sentencing Commission's policy statements, any departures from the advisory guideline range clearly apply. Finally, I determine the appropriate sentence in light of the factors set forth in 18 U.S.C. § 3553(a). See, e.g., United States v. Pallowick, 364 F. Supp. 2d 923, 925-26 (E.D. Wis. 2005).

## II. APPLICATION

### A. Guideline Calculations

The PSR assigned a 2 level enhancement for abuse of a position of trust, stating that defendant's job allowed her to conceal and continue her criminal activity. U.S.S.G. § 3B1.3 states: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense,

2

increase by 2 levels." In order for the enhancement to apply, the government must show that (1) the defendant occupied a position of trust and (2) her abuse of that position significantly facilitated the commission of the offense. United States v. Davuluri, 239 F.3d 902, 908 (7th Cir. 2001).

In the present case, the parties did not dispute that defendant abused her position to commit the offense but argued over whether her job was a "position of trust." Application note 1 to § 3B1.3 provides:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3 cmt. n.1.

Defendant argued that although her job title was "administrative assistant" she was essentially a secretary, whose duties included opening the mail, answering the phone, paying bills, and processing expense reports. Although she could complete and submit "vendor action request forms" and invoices, actual payment required the approval of higher-ups in the company. She compared herself to a bank teller or hotel clerk.

3

I agreed with the government that defendant occupied a position of trust. The Seventh Circuit has held that the "sentencing court must look beyond formal labels to the relationship between the victim and the defendant and the responsibility entrusted by the victim to the defendant." United States v. Davuluri, 239 F.3d 902, 908 (7th Cir. 2001). Instead of job titles, the court "should consider the 'amount of access and authority over valuable things' that the defendant had." United States v. Hernandez, 231 F.3d 1087, 1090 (7th Cir. 2000) (quoting United States v. Sierra, 188 F.3d 798, 802 (7th Cir. 1999)).

The record in the present case showed that defendant had access to Sodexho's payment processes and little day to day supervision. In fact, most days she ran the office alone. This allowed her to devise and implement a scheme to steal for an extended period of time without detection. Due to her effective control over who got paid and when she could hide her theft by not paying legitimate vendors, thereby keeping her theft within the budget. The fact that others had to approve the payments did not change the fact that defendant was able to control the payments she directed to herself, creating the invoices and making them appear legitimate. Payment approval was essentially pro forma and did not involve scrutinizing what defendant submitted. The Seventh Circuit has repeatedlty upheld imposition of the enhancement under such circumstances. See United States v. Deal, 147 F.3d 562, 563 (7th Cir. 1998) (finding that a shopping center comptroller who was subject to direct supervision in submitting checks for payment held sufficient authority in his position to garner the trust of his supervisors, which then enabled him to evade detection while he stole money from the company); see also United States v. Cruz, 317 F.3d 763, 767 (7th Cir. 2003) (finding that although the defendant had no discretion to make payments or sign checks, her position allowed her to steal nearly $121,000 over two years because she had

4

earned the trust of her supervisor, who did not question her ledger entries or the propriety of the checks submitted to him for approval); Hernandez, 231 F.3d at 1091 (finding that a staff accountant held a position of trust based on his autonomy in preparing check request forms, his supervisors' virtual rubber-stamping of his work, and his ability to use routine forms to route large payment checks directly into his own hands).

Although it was not necessary to analyze relevant conduct to justify the enhancement, I also agreed with the government that defendant abused her position of trust by using Renninger's secret password to gain access to Renninger's voice mail account and erase the message about the unemployment hearing, and by using Renninger's e-mail account to obtain a computer on Sodexho's dime. Clearly, this was not the sort of information a teller or clerk would have. Rather, it was because defendant's supervisor so trusted defendant that she was able to commit these additional fraudulent acts.

This was not a situation comparable to a teller or clerk taking money from the till. A bank or hotel can count cash at the end of the day and quickly see if anything is missing. Sodexho could not do that in the present case because defendant's position allowed her to make the payments appear legitimate and to hide them for an extended period of time. Therefore, the enhancement applied.

**B.     Imposition of Sentence**[1]

In imposing sentence, I must consider the factors set forth in § 3553(a), which include:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

---

[1] Neither party requested a departure.

(2) the need for the sentence imposed--
 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
 (B) to afford adequate deterrence to criminal conduct;
 (C) to protect the public from further crimes of the defendant; and
 (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

After considering these factors, I must "'impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2).'" United States v. Galvez-Barrios, 355 F. Supp. 2d 958, 960 (E.D. Wis. 2005) (quoting 18 U.S.C. § 3553(a)). I typically group the § 3553(a) factors into three categories: the nature of the offense, the history of the defendant, and the needs of the public and any victims. United States v. Ranum, 353 F. Supp. 2d 984, 989 (E.D. Wis. 2005). I then consider the types of sentences available, the guidelines and policy statements, and the need to avoid disparity in order to produce a reasonable numerical sentence.

### 1. Nature of Offense

This was a somewhat aggravated offense, given defendant's abuse of trust over an extended period of time. Although the amount taken was not all that large, as these cases go, the further fraud she committed in obtaining unemployment benefits was brazen, as was her submission of another false invoice after her employment was terminated and a postal inspector had interviewed her about the matter.

6

It was difficult to discern the motivation for the offenses. There was no evidence of dire financial straights, or a gambling or drug problem. At sentencing, defendant indicated that she was suffering from depression at the time, which caused her to act recklessly because she did not care what happened to her.

### 2. Character of Defendant

Defendant was married and had three school-aged children. She had a fairly solid employment history and her prior record was minimal, consisting only of an ordinance violation for writing a bad check. As noted, she suffered from depression, which stemmed largely from her physical problems. Defendant has Charcot Marie Tooth Disease, a serious neurological disorder, which was causing her to lose normal use of her legs and arms due to nerve degeneration. At the time of sentencing, one of her legs was in a cast after she suffered a fall due to her diminished ambulation. Defendant's sister, who suffers from the same disease, recently lost her big toe.

### 3. Needs of Public

There was no evidence that the defendant was dangerous or that the public needed to be protected from her. However, there was a need for confinement to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. As noted, restitution had been paid in full.

### 4. Consideration of Guidelines and Imposition of Sentence

The guidelines called for a prison term of 12-18 months. Under all of the circumstances, I concluded that this range was just slightly greater than necessary to satisfy the purposes of sentencing. For several reasons, a sentence that was effectively one level

7

below this range was proper. The resulting range allowed for a split sentence, providing some incarceration but recognizing that other mitigating factors supported a sentence served partially in the community.

First, defendant made full restitution, more than $50,000, prior to sentencing. The evidence showed that although she borrowed $20,000 from her parents ($10,000 of which had been repaid by the time of sentencing), she and her family sacrificed to make the payment, refinancing their home to take advantage of every dollar of equity. One of the weaknesses of the mandatory guidelines was that they did not allow the court to recognize different gradations of acceptance of responsibility. Application note 1 to § 3E1.1 lists various factors the court should consider, one of which is voluntary payment of restitution. However, a defendant who made full restitution and also admitted his conduct, pleaded guilty and expressed remorse would under the guidelines receive the same 2 level reduction as a defendant who made no payments. Under an advisory system, the court may recognize different degrees of acceptance and reward those, like defendant, who made additional efforts. Given the evidence of sacrifice by defendant and her family to make the payment, this was not a situation where a well-to-do defendant tried to buy her way out of prison. Although she had some means, I had seen many defendants with equal or greater resources fail to make a similar effort to rectify their wrong-doing.

Second, defendant had three small children. Although her husband could care for them during a prison term, such term would also be harder on defendant and her family than in the typical case. Third, defendant's neurological disorder made it difficult for her to move and was apparently getting worse. This would make prison more difficult for her than the typical defendant. Finally, defendant suffered from serious depression, which, although not

an excuse for her conduct, likely contributed to her reckless behavior. At sentencing, she indicated that since she had begun counseling and taking medication her life had turned around. Allowing defendant to serve part of her sentence in the community allowed her to continue with mental health treatment, which seemed to be working.

With a one level adjustment, the range was 10-16 months, allowing a split sentence, which I considered reasonable. This allowed a period of imprisonment, which was appropriate based on the seriousness of the offense, followed by a period of home confinement. I imposed a sentence in the middle of the range as modified based on the somewhat aggravated nature of the crime. I believed that a total sentence of 12 months, which was equal to the low end of the applicable guidelines, was sufficient to satisfy the purposes of sentencing. Because the sentence varied only slightly from the guidelines and was appropriate based on the particular facts of the case, it did not create unwarranted disparity.[2]

Therefore, I sentenced defendant to the custody of the Bureau of Prisons for a period of six months on counts one and two to run concurrently. I determined that based on her financial situation she did not have the ability to pay a fine and so waived the fine. However, I ordered community service as a condition of supervised release in lieu of the fine.

Upon release from prison, I ordered defendant to serve a two year supervised release term. I imposed various conditions designed to protect the public from the possibility of future misconduct and to serve defendant's correctional needs. These conditions included a prohibition on employment having fiduciary responsibilities without first notifying the

---

[2]A sentence of 12 months and one day, with credit for good time, would have resulted in 10 months of actual imprisonment, just four months more than I imposed.

9

employer of the conviction, or self-employment having fiduciary responsibilities without consent of the supervising probation officer; provision of all financial information requested by the supervising probation officer and monthly financial reports; participation in a mental health treatment program; performance of 25 hours of community service work per year, in lieu of a fine, at the direction of the supervising probation officer for a total of 50 hours; and home confinement for a period not to exceed 180 consecutive days. Additional conditions appear in the judgment.

**SO ORDERED**

Dated at Milwaukee, Wisconsin, this 28th day of June, 2005.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

10

Case 2:04-cr-00224-LA   Filed 06/28/05   Page 10 of 10   Document 29